April 20, 1906.

————O————

No. 3880.

(Court of Appeal, Parish of Orleans.)

## L'HOTE & CO. vs. CHURCH EXTENSION SOCIETY OF THE METHODIST EPISCOPAL CHURCH et al.

1. The mere fact that a foreign religious corporation owns church

property in this state, and that it has collected a fire loss here, and has instituted a suit in a Louisiana Court to assert a right or protect its interest, does not constitute the "doing of business in this State," in the sense of Act 149 of 1890.

2. Act 180 of 1894, relative to contracts for buildings and the security of workmen and furnishers of material was not intended to, and does not extend the term of prescription of the claim of the furnisher of material against the owner who had taken and recorded a bond as provided by this act.

3. On the merits, the fact is established that the Judgment sought to be annulled, was, as is alleged, rendered without citation.

Appeal from Civil District Court, Div. ———

E. H. McCaleb, Jr., and Dinkelspiel & Hart, for Plaintiff and Appellee.

Pierre Crabites, Merrick, Lewis & Gensler, for Defendant and Appellant.

MOORE, J. On the 9th Feby., 1904, L'Hote & Co. obtained a judgment against the Board of Church Extension of the Methodist Episcopal Church under its former name of "The Church Extension Society of the Methodist Episcopal Church," a corporation duly chartered and organized under the laws of the State of Pennsylvania for the sum of fourteen hundred dollars, with eight per cent per annum interest thereon from April 16th, 1896, subject to certain credits therein stated, and with recognition of a "first lien and privilege" upon defendant's certain described property situated in the City of New Orleans.

Upon the judgment creditor's attempt to execute this judgment, they were arrested by an injunction, sued out by the judgment debtor on the ground that the judgment was an absolute nullity for asmuch as it was rendered without citation, and its nullity was accordingly prayed for.

It appears that the corporation against which this judgment was rendered is an eclesiastic association, or what might be termed a congregatio de propaganda fide, according to the doctrines and descipline of the Methodist Episcopal Church. Its particular method of propagating the faith, or, as its charter declares, of "assisting the several annual conferences of the Methodist Episcopal Church to extend and establish the insti-

tutions of Christianity throughout the United States and Territories," is by "aiding, whenever necessary, to secure suitable houses of religious worship and such other property as may promote the general design."

It further appears that on the 8th Feby., 1872 a congregation professing the Methodist Episcopal faith and organized under the name of the "Marais Street Methodist Episcopal Church," acquired in its name from one John H. Rhodes, a certain portion or lot of ground situated in the City of New Orleans and erected thereon a house of worship. This association subsequently became financially involved and, in addition to a sum of something over $2500, which it owed to the Board of Church Extension of the Methodist Episcopal Church which had assisted the "Marais Street Church" Association, or congregation, to this extent, it also owed one Scherferin Doebele the sum of $3600, in principal, which was secured by mortgage on the church building and ground. Doebele having foreclosed his mortgage the church property was adjudicated to him at the foreclosure sale on the 7th Aug., 1879. Faithful to its principles, and true to the object and purpose of its creation, the Board of Church Extension again came to the assistance of those who had worshipped at that church and on the 7th day of May, 1879, it acquired, by conventional sale from Doebele the property, paying therefor $2335.00 in cash and taking title in its own name.

About this time those of the Methodist Episcopal faith who were desirous of continuing worship in this church organized themselves into a purely voluntary association and designated their association the "Union Chapel of the Methodist Episcopal Church," and perfected a church organization by the selection of such officers as the constitution and rules of the Church of that faith provide.

Thereupon the Board of Church Extension, without in any manner relinquishing its ownership of the property, or constituting the "Union Chapel," or any of its officers or any member of its congregation, its agents or representatives, gave its sanction and permission to the Union Chapel, to use the church

307

building for its place of worship, which the Union Chapel did and continues to do.

During the month of February, 1896, the Union Chapel, representing that the Church was in need of repairs, applied to the Board of Church Extension for its permission and consent to allow the Union Chapel to make the repairs. Permission to do so was refused. It was very evident that the Board of Church Extension realized that the Union Chapel would not, or could not pay for same, and that the result of its consent being given to the Union Chapel to allow it to make the repairs, would be that the Board of Church Extension would have to pay for same, which it was not willing to do as the Union Chapel had already been assisted by the Board of Church Extension to the extent of $6377.79, which was still due it by the Union Chapel.

To this request the corresponding secretary of the Board of Church Extension wrote to the Union Chapel: "We are not willing to act without full information. I suppose that the effect of our consent to make repairs would be to validate any claim that might be created for labor and material and expose the property to sale under mechanics lien. We have practiced the utmost generosity and forbearance in regard to the indebtedness of the Union Chapel and our Board cannot consent to any course that would put that claim in peril. Please confer with the trustees, let the facts be fully and clearly stated and careful esimates be made of the cost of needed repairs and of the resources available there for making them, and send such information to me. We will then take up the question and act intelligently with full knowledge of the facts, but as at present advised, with our claims unsatisfied, we must object to the creation of a lien upon the property for labor or materials."

This seems to have ended the matter so far as any direct appeal by the Union Chapel to the Board of Church Extension was concerned. Nor does it appear that any suggestion contained in the above letter of the Corresponding Secretary of the Board of Church Extension was ever adopted and acted upon by the Union Chapel. Subsequently, however, the Rev.

L. G. Adkinson, who acted in an advisory capacity between sundry churches in Louisiana and the Board of Churh Extension was prevailed upon by the Union Chapel to act for it in an effort to adjust its financial differences with the Board of Church Extension. Thereupon the Rev. Mr. Adkinson wrote to the Corresponding Secretary of the Board of Church Extension suggesting, as a means of liquidating the Union Chapel's indebtedness to the Board of Church Extension and as offording the former an opportunity to repair the church, that the Board of Church Extension "close up the whole matter by reducing the claim to the lowest figure possible, put it in the shape of a new loan; take a mortgage and deed the property to the Board of Trustees," of the Union Chapel.

To this letter the Secretary of the Board of Church Extension replied on the 13th March, 1896. In his answer he recited the Board of Church Extension's experience with the "Marais Street Church" congregation when the Board had allowed that congregation to take title in its name; how it had burdened the church property with mortgages and liens, and how it was finally compelled to buy it back again and to take the title in its (the Board of Church Extension's) own name, and intimated that the Board was not willing to go through the same experience with the Union Chapel. The corresponding Secretary suggested, however, that the Board of Church Extension would take $3000 for its debt of $3377.79, if paid in cash, and then deed the property to the Union Chapel, *to be held by it only in trust,* however, for the Methodist Episcopal Church, adding, "but as at present advised it does not seem to us wise to deed the property to the local church or its trustees and take from them a mortgage for the less amount due. A mechanic's lien would hold the property for any improvements made whether such improvements were made with our consent or not." Then he again suggests that "a competent architect or builder make a careful examination and state in writing what improvements are necessary and the estimated cost of the same; that the presiding elder, pastor and trustees make a thorough canvass and report what amount they can raise for such repairs and improvements and report the facts to us. If they can raise an

amount sufficient to pay for repairs and improvements, we will consent, of course, that they shall be made. If after a thorough canvass they find this impossible, let them make formal application for donation of the least amount that will enable them to do so and have the Conference Board make a formal recommendation and forward application to us."

Neither the offer to compromise the debt on the terms stated was accepted nor the suggestions adopted; the Rev. Mr. Adkinson writing to the Board of Church Extension on the 25th Mar., 1896, that nothing could be done; and as important as showing for whom he was acting in this matter, a question which we will have to hereafter consider as the service of citation was made on him, he adds: "Of course, it is none of my business and I tried to keep the brethren from dragging me into it. But they begged so hard to have me try and see if some settlement could not be reached that I was over pursuaded and wrote you. Perhaps it had better drop, as there seems to be no settlement possible. They are repairing the church and will pay for the repairs and the matter can drag on as it has."

During the month of Feby., 1896, the Union Chapel entered into a contract with one Paul Broyard by which the latter undertook to repair the Church for the sum of $2450.00. Upon the completion of the work a balance of $1450.00 was due the contractor which the Union Chapel settled by its three promissory notes dated April 15th, 1896, two thereof for $500.00 payable respectively in 12 months and 18 months from their date, and an other for $450.00 payable in 24 months, with interest at eight per cent per annum from date. These notes were signed by Ursin Hill, President and Alexander Scott, Treasurer of the Union Chapel, and were subsequently transferred by Broyard to Lhote & Co., to whom Broyard was indebted for materials furnished him in the execution of his contract.

On the 8th day of March, 1899, Lhote & Co. instituted suit on these notes and sought judgment therefor against the Union Chapel, and the Board of Church Extension as the owner of the property.

Citation addressed to the Board of Church Extension of the

Methodist Episcopal Church, was on the 21 day of March, 1899, served on "L. G. Adkinson, Chairman of the Local Board of the Church Extension Society."

No further action seems to have been taken in this matter for five years thereafter, except that from the 17th May, 1899, to the 20th Nov. 1901, the Union Chapel made seven different payments to Lhote & Co. on account of these notes, aggregating the sum of $1,201.35-100. On the 30th Nov., 1903 a default was taken against the Board of Church Extension which was confirmed on the 9th February, 1904.

It is conclusively established that the Board of Church Extention knew nothing of any contract having been entered into between the Union Chapel and Broyard or with any one else for the repair of the church, or that the church was being repaired except upon receipt of Adkinson's letter dated March 25th, 1906, when the repairs were completed, or nearly so, and when advised that the Union Chapel would itself pay for same; or that there was any outstanding indebtedness for said repairs; or that any notes have been issued; or that any suit had been filed against it or that any judgment had been rendered against it for any amount and recognizing a lien and privilege on its property, until the latter part of March, 1904, when Lhote & Co. had provoked the appointment of a curator ad hoc on whom the notice of seizure had been served and whom at once notified the Board of Church Extension at its domicile in Philadelphia. Thereupon the suit for nullity of the judgment was brought and the injunction against its execution obtained.

The answer of Lhote & Co. to this suit affirms the validity of the citation on Adkinson, first, because as chairman of the Local Board of the Church Extension he was the legal representative of the parent board according to the articles of organization and government and general rules of the Board of Church Extension and second, because in any event Adkinson was a person acting or transacting the business of the non-resident corporation and is, therefore, under the provisions of Act No. 149 of 1890, deemed the agent of said corporation upon whom service can be made.

311

In the *alternative,* and in the event said judgment be declared a nullity, then they pray for judgment in reconvention against the Board of Church Extension for the sum of $740.00-100 amount of materials furnished said Broyard in repairing the said Church, and which sum it is claimed the Board of Church Extension owes because it failed to require the builder to furnish good and solvent surety and to record the same under the provisions of Act 180 of 1894. To this latter claim the Board of Church Extension interposed the prescription of three and five years.

There was judgment in favor of Lhote & Co. rejecting the demand of the Board of Church Extension, and dissolving the injunction without damages.

From this judgment the Board of Church Extension appeals which appeal is answered by the appellants who pray that the judgment be amended in their favor by awarding them damages for the dissolution of the injunction, and, in the event the judgment be reversed that then they have judgment on their reconventional demand against the Board of Church Extension.

The first question in the order of discussion is as to the validity of the service of Lhote & Co. petition and the citation thereon on Adkinson.

If, as is erroneously understood by our esteemed brother of the lower Court, what is denominated in the "Book of Doctrines and Discipline of the the Methodist Episcopal Church," as the "Conference Board," is the same body as is elsewhere .in the Book of Discipline called the "Local Board of Church Extension;" and if the "Conference Board" having this church property in charge for the parent board, the Board of Church Extension, was served with citation addressed to the parent board, the citation being served upon the proper officer of the conference board; or if L. G. Adkinson, on whom the citation was served as the "Chairman of the Local Board of the Church Extension Society" was an officer or even a member of the Conference Board, or an officer or member of the Local Board, then would the Board of Church Extension have been properly

312

brought into Court and the Judgment thus rendered against it would, therefore, have to be maintained.

But the "Conference Board and the "Local Board" are not the same. The "Conference Board of Church Extension" is appointed by each "Annual Conference" of which there are one hundred and thirty, the boundaries of which are specifically defined. There are two which embrace the State of Louisiana; one of which is known as the "Gulf Conference" and includes the "White English, Italian, and French-speaking work" in that State in addition to a certain portion of Texas. The other is known as the "Louisiana Conference" and includes the "Colored work in the State of Louisiana." All "Annual Conferences" are composed of Bishops and Ministers and Elders. At each annual conference a Presiding Bishop is nominated who shall at once appoint a "Conference Board of Church Extension" composed of equal numbers of Ministers and Laymen, consisting of a President, Vice President, Secretary and Treasurer; the Presiding Elders being ex-officio members of this Board. The Conference Board is declared to be "auxiliary to the Parent board, and shall, under its direction, have charge of all the interests and work of Church Extension within the Conference." The Parent Board has "authority to provide and recommend a uniform plan for the organization of local Boards of Church Extension in large cities, under such local administration as may be deemed advisible; but in no case shall such local organization interfere with the general work of the Board."

It does not appear that the Board of Church Extension ever provided and recommended a uniform plan for the organization of local Boards, at any rate none such was ever provided and recommended for the City of New Orleans, and no such local board exists. At least, no such board is shown to exist or ever to have existed in this City, which is the same thing. *Idem est non probari et non esse; non deficit jus sed probatio.* Hence it is that service made on "L. G. Adkinson, Chairman of the Local Board of the Church Extension Society" was not service on the Board of Church Extension, for the reason as stated, that no such local Board existed, and consequently Ad-

kinson could not have been either its Chairman or a member thereof.

Neither does it appear whether the "Interests and work of Church Extension within the Conference" quoad this particular Church property, was in "charge" of the "Conference Board" appointed by the "Gulf Conference" or by the "Louisiana Conference," or, indeed whether either "Conference" ever appointed a "Conference Board" at all.. At any rate it is shown that Adkinson was not at the time of the service of citation and petition on him, or at any time prior or since, either an officer or member of any "Conference Board" and that no other officer or member of any such Board was ever served with citation and petition.

Was Adkinson a person who, within the perview of Act 149 of 1880, was "acting or transacting the business of the Corporation" the Board of Church Extension, so as to be deemed the agent of said corporation upon whom service may be made?

This act provides in its first section that a foreign corporation doing business in this State shall file a declaration, in the office of the Secretary of State, of the place or locality of the domicile, together with the name of its agents or officers in the State representing said corporation upon whom service of process may be made. Its second section provides: "Whenever any such Corporation shall do any business of any nature whatsoever in this State, without complying with the requirements of this act, it may be sued upon any cause of action in the parish where the cause or right of action arose and service of process may be made upon the person or persons, firm or company, acting or transacting such business for said corporation and such person or persons, company or firm shall be deemed the agent of said corporation upon whom service of process may be made.

Pretermitting the question whether a purely religious association domiciliated in another state, but owning church property in this state from which it derives, and is intended to derive, no revenue or profit whatsoever, but which simply permits the use of its church property for religious worship, may

314

be considered doing business in this state in the sense of this statute, it behooves us to inquire whether Adkinson was "acting or transacting such business for such corporation."

It is made absolutely certain that so far as concerns the repairs to the church, Adkinson was not "acting or transacting" that "business" for the Board of Church Extension, but that the Board of Church Extension was not engaged or concerned in that "business" at all; that all this work was done without its consent and without its knowledge and that hence neither Adkinson, nor any one else, was "acting or transacting business for it.

Adkinson, as we have shown by his own letter addressed to the Corresponding Secretary of the Board of Church Extension on the 25th March, 1896, was acting for the Union Chapel and not for the Board of Church Extension. He was "dragged" into it, he writes, by his brethren of the Union Chapel. "They begged so hard to have me (him) try and see if some settlement could be reached, that I (he) was over persuaded and write you (the secretary of the Board at Philadelphia).

The other "business" which he transacted for the Board of Church Extension was to file an Intervention, for and on behalf of that corporation in a certain suit then pending in the Civil District Court entitled George L'Hote vs The City of New Orleans in which it was sought to enjoin the City authorities from establishing a new district for leud and abandoned women. This he did under special power of attorney, dated the 15th November, 1897, and limited to this purpose. He also, in March, 1896, collected for the Board of Church Extension a fire loss on certain other property owned by that corporation. This he also did by special and limited power of attorney.

Intervening in a suit to protect one's interest or to assert a right or collecting a claim and receipting for same, is certainly not doing business in the sense in which this word is employed in the Statute of 1890. And if these particular acts are performed through and by a representative of the foreign corporation the former may not, therefore, be thus regarded as acting or transacting such *business*," and thereby "deemed the agent

315

of said corporation upon whom service of process can be made," at least, not so far as the suit in which the service is made concerns or affects matters not connected with, growing out of, or relating to these transactions.

It also appears that service of petition and citation was also made on the Rev. Henry Taylor. The citation was addressed to, and served on him as "pastor of the Church Extension Society of the Methodist Episcopal Church, representing the Board of Trustees of the Union Methodist Episcopal Church, New Orleans;" but it is not seriously contended that this service was good as to the Board of Church Extension. This service was doubtless intended to bring into Court the Union Chapel, as Taylor was its pastor when the repairs were made. He was not the pastor of the Board of Church Extension, for it has no pastor and never had a pastor; neither was he an officer or member of the parent Board of Church Extension or of any subvidiary or auxiliary board of such; nor did he at any time act in any matter or thing, whatsoever. Our conclusion, therefore is that the judgment rendered against the Board of Church Extension is an absolute nullity.

Neither can L'Hote & Co. recover judgment on their reconventional demand for the price of the materials furnished to the contractor who employed same in the repairs to the Church.

Concede, for the argument, that the Board of Church Extension was originally liable for the cost of all material used and employed in making the repairs, notwithstanding the fact that the Union Chapel contracted for this work in its own name and for its own account and that the contract was made against the consent, and the work performed without the knowledge of the owner, the Board of Church Extension; that the relation of landlord and tenant did not exist between the owner and occupant; that the contractor was "familiar with the situation to the fullest extent," was advised at the meeting of the Board of Trustees of the Union Chapel when the arrangement for the contemplated repairs was under discussion that the property did not belong to the Union Chapel and that if "he put any of his materials in that building he would lose it," so far as any

316

payments might be expected from the owners; and that he replied:

"Gentlemen, I have your word for this thing and I am about to make this on faith, and I don't know from whom I am going to get my money;" that he received payments for a portion of the contract price from the Union Chapel, and for the balance thereof demanded and received the three notes of the Union Chapel which he said was to be given to the furnisher of materials for the amount due therefore; that the notes were transferred to the material men, L'Hote & Co.; that subsequently L'Hote & Co., as owners of the notes, never asserted any claim against any one on the account for materials, but on the contrary dealt with the Union Chapel as the association bound on the notes collecting from it seven different payments on account, aggregating the sum of $1201.35-100, between the 17th May, 1899, and the 19th Nov., 1901; conceding we say, that notwithstanding these facts, the Board of Church Extension, as the owner of the Church property, is liable for the material, yet it is that L'Hote & Co. cannot recover for same because the claim is prescribed under Art. 3538 C. C., which provides that action on "accounts of merchants, whether selling for wholesale or retail," and "that on all other accounts," are prescribed by 3 years. The account sued on began on the 7th April, 1896, and the last item charged is on the 30 April, 1904.

The suit thereon—L'Hote & Co's. reconventional demand—was filed April 30th, 1904, more than eight years after the last item on the account. It is contended by L'Hote & Co. on this branch of the case that although the account of a merchant for materials furnished by him and used in the repairing, reconstruction or erecting of a building by the owner, is under the general law, prescribed in three years, nevertheless Act No. 180 of 1894 entitled an act relative to contracts for buildings and the security of workmen and furnishers of material, operates to convert the action for the price of such material from an action on an "account" to a "personal action," when the owner, in a contract exceeding $1000.00, has failed to require of the contractor a bond and security as provided by this statute.

317

We do not so construe this act. It was not intended to and does not impose on the owner any burden or obligation greater than to make him pay irrespective of the service of an attested account, under the general law.

The act was intended to and does relieve him of responsibility to the material men and laborers if he complies with its provisions by taking a bond and security and by recording same and the contract, within the time in the manner prescribed by the act. If he does not do so the measure of personal responsibility then rests upon him.

The period of presciptibility of the action of the material men and of the workmen, against the owner, in the event no bond is required by the latter, as prescribed by Arts 3534 and 3538, is not affected in any manner whatsoever, by the Act of 1894, because the latter makes no change in the character or nature of the obligation.

But whether it is or not so affected, and conceding, for the argument, that L'Hote & Co's. action is prescribed under Act of 1894 only in ten years, this act can have no possible bearing or effect on the issue here for the reason that it contemplates a contract made by the owner of the building, or by some person or persons authorized by him.

It can have no application to an owner who never directly or indirectly, by himself or by another for whose action he is bound, made or authorized any such contract, and who had no knowledge that any such contract had been made or that any such work thereunder was being done on his property, as is the case here.

Considering the case from every view point we conclude that the judgment sought to be annulled is an absolute nullity and that the reconventional demand must be rejected.

It is therefore ordered, adjudged and decreed that the judgment appealed from be and the same is hereby reversed, set aside and annulled and it is further ordered, adjudged and decreed that the Board of Church Extension do have judgment in its favor and against L'Hote & Co., annulling the judgment rendered on the 9th day of February, 1904, and signed on the

18th day of February, 1904, in suit entitled L'Hote & Co. vs. Church Extension Society of the Methodist Episcopal Church, et als. No. 58734 of the Docket of the Civil District Court, Parish of Orleans, Div. "C."; that the adjudication sued out to restrain the sheriff of the Parish of Orleans and the said L'Hote & Co., from executing said judgment be maintained and that the reconventional demand of L'Hote & Co., be and the same is hereby rejected.

The costs of both Courts to be taxed against L'Hote & Co.

April 20th, 1906.

Rehearing refused May 14, 1906.

Writ refused by Supreme Court, June 7, 1906.